1

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
      Case No. 22-cr-00120-PAB-1
3     _____

4     UNITED STATES OF AMERICA,

5          Plaintiff,

6     vs.

7     OMAR ANTONIO PACHECO-MONJE, etc.,

8          Defendant.
      _____
9

10             Proceedings before N. REID NEUREITER, United

11    States Magistrate Judge, United States District Court for

12    the District of Colorado, commencing at 1:59 a.m., April 14,

13    2022 in the United States Courthouse, Denver, Colorado.

14    _____

15             WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17    _____

18                        APPEARANCES

19             VALERIA N. SPENCER, Assistant United States

20    Attorney, appearing for the Plaintiff.

21             KILIE A. LATENDRESSE, Deputy Federal Public

22    Defender, appearing for the Defendant.

23    _____

24                      DETENTION HEARING

25
```

2

```
 1                  P R O C E E D I N G S
 2              (Whereupon, the within electronically recorded
 3  proceedings are herein transcribed, pursuant to order of
 4  counsel.)
 5              THE COURT:  We are on the record in 22-cr-00120,
 6  USA vs. Pacheco-Monje.
 7              Appearances from the United States, please.
 8              MS. SPENCER:  Good afternoon, Your Honor.  Valeria
 9  Spencer on behalf of the United States.
10              THE COURT:  Good afternoon.  And for the
11  defendant.
12              MS. LATENDRESSE:  Good afternoon, Your Honor.
13  Kilie Latendresse on behalf of Mr. Pacheco-Monje, who is
14  present before the Court.
15              THE COURT:  And do we need to swear the
16  interpreter.
17              COURTROOM DEPUTY:  Yes, Your Honor.
18              (Interpreter sworn.)
19              THE INTERPRETER:  I do.
20              COURTROOM DEPUTY:  Thank you.
21              THE COURT:  So we are here for a detention; is
22  that correct?
23              MS. SPENCER:  Yes, Your Honor.
24              MS. LATENDRESSE:  Yes, Your Honor.
25              THE COURT:  All right, I will hear from the United
```

1    States.

2           MS. SPENCER:  Your Honor, we ask you to take

3    judicial notice of the Pretrial Services Report, which is

4    recommending detention in this case.

5           THE COURT:  And I have read over that.

6           MS. SPENCER:  All right.  The analysis that the

7    Court has to consider under 18 United States Code Section

8    3142(g) is by clear and convincing evidence if there's

9    conditions or a combination of conditions of release that

10   will reasonably assure the safety of any other person in the

11   community and by a preponderance of evidence that no

12   condition or combination of conditions of release will

13   reasonably assure the defendant's appearance as required.

14          Now, after the Tenth Circuit came out with the

15   Ailon-Ailon decision, we sort of backed away from saying

16   that an immigration hold created a flight risk, because they

17   were very clear that that's not a flight risk when it's an

18   involuntary nonappearance.

19          But what they were looking at was the serious risk

20   that a person would flee, as opposed to what the Court needs

21   to consider now, which is:  Are there a combination of

22   conditions of release that reasonably assure the defendant's

23   appears as required?  Whether it's voluntary or not, Ailon

24   decision doesn't drift down to that particular factor.

25          And, certainly, there is an INS Hold on the

1    defendant, an ICE Hold, so he would not be allowed to

2    appear, as required, if he was released on bond.  He would

3    be released back into ICE custody and a deportation

4    proceedings would go forward.

5          THE COURT:  So how does that work, so deportation

6    proceedings go forward?  So if he is released on bond,

7    deportation proceedings go forward, he is detained by ICE.

8    Do they deport him, even if there is a trial date for trial?

9    Or do they say, Oh, we are going to hold off the deportation

10   because he has got to appear in front of -- is it Judge

11   Arguello, or whoever?

12         MS. SPENCER:  It's Judge Brimmer.

13         THE COURT:  It's Judge Brimmer, right -- where he

14   will be sentenced -- or he may be sentenced if convicted and

15   then we'll deport after he sort of -- how does that all

16   work?

17         MS. SPENCER:  Great question because the Bond

18   Reform Act and Immigration Naturalization Action are two

19   private tracts that are going on.  So under the INA,

20   Immigration Naturalization Act, ICE only has a certain

21   amount of time to hold someone before they must deport, so

22   they cannot hold him based on court dates.

23         So if Your Honor were to release him on the case

24   and he gets out, he will be released back into ICE custody

25   because of the hold that they have, but then they have 30

1  days in which to turn him around and get him deported.  So

2  they are allowed to do that under the law.  They cannot

3  honor the dates that Your Honor has set forth for returns

4  into court, they can't honor any of those.  They have to

5  deport within a certain amount of time and they will do so.

6          That's sort of the tricky thing, and I'm glad you

7  asked that, because the two operate separately from one

8  another.  ICE isn't checking to see, Well, what other holds

9  does he have?  Or does he have court dates coming up in

10  state court or federal court?  They don't consider those

11  things, because they cannot.

12          THE COURT:  So does that happen to the United

13  States Attorney's Office here in Colorado, where you have

14  somebody who is set for trial, but because there's an ICE

15  Hold, ICE has deported the person before the trial happens?

16          MS. SPENCER:  Yes.

17          THE COURT:  I see.

18          MS. SPENCER:  That does occur.

19          Now, if Your Honor doesn't want to take that into

20  consideration, you do need to look at the other factors that

21  are outlined in the Pretrial Services Report and I can add

22  more information on that.

23          Of course, the weight of the evidence against the

24  defendant is strong in this case, and so we are able to meet

25  those factors beyond a reasonable doubt and could prevail at

1  trial.

2          The defendant is subject to a period of

3  incarceration upon conviction, at least a year, and perhaps

4  more, depending on the guidelines and what Judge Brimmer

5  thinks is appropriate.

6          THE COURT:  Is it a year minimum, though?

7          MS. SPENCER:  It is not a minimum mandatory, but

8  that is the range he is looking at, at least puts him at a

9  year.

10          THE COURT:  This is his second reentry after

11  removal, right?  Am I wrong about that?

12          MS. SPENCER:  I'm trying to find the notes here, I

13  apologize.

14          He actually has been removed six times already.

15          THE COURT:  Oh.

16          MS. SPENCER:  I don't have my papers, I'm sorry.

17          THE COURT:  Yeah.  I saw multiple, sort of

18  deported in 1995, at least.

19          MS. SPENCER:  He started being removed from the

20  United States in 1995 through -- through 2009.  He was

21  encountered in 2018 when he was being held in that Denver

22  case that resulted in that serious felony, but ICE lodged a

23  detainer with the Denver Police Department and it was not

24  honored, which is to say they released him when he was done

25  with that case without notifying or honoring the Hold on ICE

1    -- from ICE.  So they had to then search for him in the

2    community and pick him up.

3              So that's why there is that delay in time period.

4    So as I said, he has been removed now five -- I'm sorry, six

5    different times showing an inability or not caring about

6    following this country's orders about not coming back into

7    this country without the proper legal authorities.

8              It's clear from the Pretrial Services Report that

9    that he does have some family ties here, but that sort of

10   cuts both ways, in terms of, Well, he has an incentive to

11   stay because he has family here.  I look at it a little

12   bit -- a little bit differently in terms of what he is

13   looking at.

14             While his reentries into the United States might

15   have been driven by a desire to be with his family, or to

16   find work here, while he has been here, he has engaged in a

17   lot of criminal history, a lot of criminal activity.  I

18   mean, that is something the Court should consider as well.

19             Knowing that he is facing deportation, knowing

20   that he is facing a prison sentence and then deportation,

21   certainly makes the calculus of one that he might want to

22   flee to avoid prosecution in this case may be more important

23   to him than staying here with his family.  The evidence is

24   overwhelming, he is highly likely to be convicted, to face a

25   prison sentence, and then be deported.

1          So under those circumstances, living apart from

2  his family as a fugitive, but in the United States, might be

3  preferable to being incarcerated where he is going to

4  subsequently be deported.

5          Preemptively, he can flee to Mexico and hope to

6  sneak back in, as he has done numerous times before.  And

7  that may be a preferrable option, as well, to being

8  incarcerated.

9          So the opportunity for him to flee, if the Court

10  lets him out and for some reason ICE Hold doesn't hold, it's

11  something that the Court needs to consider, as well.

12          As I said, it's obvious he is subject to

13  deportation.  He doesn't have legal status here in this

14  country.  So even though he lists that he has some income

15  and he has been working, none of that is legal.

16          So if Your Honor were to set forth conditions to

17  reasonably assure his placement -- or his coming back to

18  court, he cannot work legally in this country.  And that's

19  something that I cannot say strongly enough.  People poo poo

20  it, but that's a fact.

21          The defendant, it looks like, has been able to

22  evade detection in this country by using no less than eight

23  aliases, three different dates of birth and two Social

24  Security numbers.

25          I have a current case now where somebody was using

1    someone else's Social Security number and ended up with that

2    real person getting into trouble with Social Security where

3    he was receiving SSI and they wondered why they were showing

4    that he was working in Colorado and still collecting SSI.

5    It's because someone had stolen his Social Security number.

6          That's what this defendant is doing by using two

7    other Social Security numbers.  If they don't show as fake

8    numbers, they are showing as somebody's, and he is choosing

9    to use that, that is, to defy the laws of this country, so

10   that he can work under the desk.  And that's something that

11   needs to be considered, as well

12         The defendant does have three prior felonies and

13   two misdemeanors.  One of the misdemeanors, includes a DUI

14   and the prior felonies, the carjacking, the possession of

15   the weapon by a previous offender and, of course, the most

16   recent one, the second-degree assaults causing serious

17   bodily injury.  So there is a history of violence that needs

18   to be considered.  I know the DUI is old, but that's, you

19   know, a history of alcohol use, as well.

20         Because I don't know how long he has been working,

21   I don't know if he has got any kind of stable employment.

22   The notion that he can go back to work, as it says, again is

23   troubling because that is simply illegal to do so.

24         Your Honor, as I said, the Pretrial Services

25   Report is a very clear about the concerns that they have

1    about any bond conditions, being able to satisfy the Court

2    that he is not going to be a danger to the community or that

3    will reasonably assure his appearance here if we pretend

4    that there is no ICE Hold, which, of course, is difficult

5    for me to avoid because that is a reality.

6            So I would ask that the Court find that there are

7    no combination of conditions that can reasonably assure his

8    appearance and hold him pending the outcome of this case.

9            THE COURT:  Okay.  Thank you very much.

10           For the defendant.

11           MS. LATENDRESSE:  Your Honor, before I begin my

12   argument, I do have a letter from his employer confirming

13   that he does have gainful employment here and I would ask to

14   present that to the Court as an exhibit.  I have a courtesy

15   copy for the prosecution.

16           THE COURT:  Sure.

17           MS. LATENDRESSE:  I'm sorry, would the Court --

18           THE COURT:  You can just bring it up.  The letter

19   does raise the question of:  How is that legal?

20           MS. LATENDRESSE:  And, Your Honor, I do not have

21   the specific details about the employment arrangement.  I do

22   know that Mr. Pacheco-Monje, one, he does pay taxes and that

23   -- the IRS has set up a way for even undocumented

24   immigrants, as is here alleged, to pay taxes.  And I

25   believe, although I don't know the details, that there are

1    some mechanisms for obtaining employment, as well.  But,

2    Your Honor, I submit that to the Court to just, one,

3    demonstrate his strong ties to the community.

4           The Government has filed a notice that they are

5    seeking to detain -- or seeking detention for Mr.

6    Pacheco-Monje under 18 USC 3142, subsection (f)(2).

7           So Your Honor, as a threshold matter, before we

8    can reach the issue of whether or not there are conditions

9    of release that would guarantee his appearance and

10    reasonably assure his appearance in court and the safety of

11    the community, they must prove that he poses either, (a) a

12    serious risk of flight, or (b) a serious risk that such

13    person will obstruct or attempt to obstruct justice or

14    threaten, injure or intimidate -- or attempt to threaten,

15    injure or intimidate a prospective juror or witness in the

16    case.

17           Your Honor, they have not presented any evidence

18    or made any argument with respect to subsection (b) so I'm

19    going to focus on this allegation that he poses a serious

20    risk of flight, which the Court must make a finding of as a

21    threshold matter.

22           THE COURT:  Hold on.  Direct me to 3142(f)(2), you

23    say?

24           MS. LATENDRESSE:  Yes, Your Honor.

25           THE COURT:  Okay.  All right, (f)(1), (f)(2):

1   Serious risk of person will flee.  Or obstruct justice,

2   threaten, injure, intimidate, attempt to intimidate or

3   threaten, a prospective juror, witness.

4            Okay, go ahead.

5            MS. LATENDRESSE:  And Your Honor, as the

6   Government pointed out in the case of Ailon and Ailon, the

7   Tenth Circuit clearly found, and unequivocally found, that

8   the fact that a person may be subject to removal proceedings

9   is not a basis for the Court to find a serious risk of

10  flight.

11           And so outside of that, the Government has

12  basically submitted an argument that he might flee, he might

13  choose to sort of flee Denver, Colorado, and live in the

14  United States outside -- away from his family or that he

15  might flee back to Mexico, but they have not presented any

16  evidence or proffered any evidence in support of that

17  argument.

18           And what we have is evidence that he did not pose

19  a serious risk of flight --

20           THE COURT:  That he has six times ignored orders

21  not to return to the United States, right?  So that's a

22  defiance and a failure to follow Court orders.

23           MS. LATENDRESSE:  Your Honor, I want to clarify

24  that -- while Pretrial Report does suggest that he has been

25  deported multiple times, I don't know that it's six times.

13

1    I count --

2              THE COURT:  Well, whether it's four or six.

3              MS. SPENCER:  I have those years here, if Your

4    Honor wants those.

5              MS. LATENDRESSE:  It looks like there are three

6    that are documented in the Pretrial Report.  I have not

7    received any information about other times when he has

8    allegedly been deported.

9              I do want to point out, too, with respect to the

10   Pretrial Services Report, there was an argument made about

11   multiple aliases.  The name Anthony Flores-Flores appears in

12   different forums Antonio Flores-Flores, Omar Flores-Flores.

13   That is not Mr. Pacheco-Monje's name.  That is not a name

14   that he has ever used.  He did not know how this name to --

15   these names or aliases came to be associated with him.

16             But it is important because the DUI case that is

17   also recorded in the Pretrial Report from 2006, my

18   understanding is that is under the name Anthony

19   Flores-Flores.  That is not Mr. Pacheco-Monje, nor his case.

20   That is not his conviction.

21             This is something, I think that has plagued him in

22   past and the last time it was addressed in state court, my

23   understanding is that the state court judge ordered the

24   Government to fix this and clear this from his record, but I

25   think that that just ended up being complicated.

 1          So that is not his case, Your Honor

 2          THE COURT:  Let me just ask -- sorry to interrupt,

 3   but the probation officer might be able to shed some light

 4   on how we get these aliases associated with the defendant.

 5          MR. HANLEY:  Your Honor, when we pull records

 6   through NCIC and NLETS, we use the list of aliases that they

 7   have that are not associated with any conjugation of the

 8   defendant's actual name, be that hyphenated surname as

 9   neither one of those surnames are set.  They are separate

10   names.

11          THE COURT:  Okay.

12          MR. HANLEY:  But somewhere along the line they

13   show up in defendant's records.  We don't know who entered

14   them or how far back they go.  That they just show up as a

15   list of aliases, they traverse Social Security number that

16   have been used by the defendant in the past.

17          THE COURT:  I see.  But you have no way of

18   independently, if the defendant says, I don't know how that

19   name get associated with me, but I never used that, you

20   don't go out and verify, other than to see on the NCIC

21   Report?

22          MR. HANLEY:  Right.  We don't have any way of

23   taking the defendant's words over an NCIC record that was

24   entered at the time of conviction or of an arrest, or

25   whatever records it is at the time.

1          THE COURT:  I see, all right.

2          MS. LATENDRESSE:  And, Your Honor, obviously the

3    defense has a duty to investigate on behalf of Mr.

4    Pacheco-Monje and that is something that I intend to follow

5    up on.  But in this short time, there was just no way to

6    gather that information, but -- except to say that that is

7    not his case and that I confirmed firm with his wife that

8    this has been a problem for them in the past and that it is

9    not his case.

10          THE COURT:  Well, what are the circumstances of

11   this assault that's happened last year?

12          MS. LATENDRESSE:  So you know, I don't know the

13   factual circumstances of the case.  But what I can say is

14   that this incident allegedly occurred in 2018.  The judge in

15   state court, you know, was required by law, under Colorado

16   state law, to -- in order to sentence him to probation,

17   which is the sentence he imposed, to make a finding that Mr.

18   Pacheco-Monje (indiscernible) supervision, a state court

19   judge under Colorado law cannot sentence someone to

20   probation without that finding and the only information I

21   have is that the judge did make that findings.  He sentenced

22   Mr. Pacheco-Monje to three years of probation.

23          It was originally a sentence of two years of work

24   release, which is why it shows up as two years of jail as a

25   condition of probation.  That's not a straight jail

1   sentence.  That's -- that was a work release sentence, but

2   then that was mitigated down subsequently to home detention.

3          Mr. Pacheco-Monje completed the home detention

4   portion of that sentence on September 21 of 2021, so last

5   September.  He remains on probation and has been complying

6   with supervision for the past two years, since January of

7   2020, he was sentenced to probation.

8          So, Your Honor -- and so with respect to the

9   allegation that he poses as serious risk of flight and the

10  Government's arguments that he is a risk of failure to

11  appear, I would submit to the Court that's powerful evidence

12  that he can and will comply with the Court's orders, you

13  know, to obviously appear in court, but also to comply with

14  any release conditions up to and including home detention if

15  the Court finds that is appropriate.

16         Mr. Pacheco-Monje has four children, his youngest

17  child is a teenage son.  He does have some special needs and

18  Mr. Pacheco-Monje obviously plays an important role as his

19  father in guiding his son and helping him to, you know, deal

20  with his disabilities on a daily basis.

21         Mr. Pacheco-Monje is the primary breadwinner for

22  his family.  His wife is a U.S. citizen.  They own their

23  home.  And -- but Mr. Pacheco-Monje is the person who is

24  financially responsible for the payments.  They have a very

25  close family.  His mother is also here in court.  She is a

1    United States citizen and she lives in the Denver area.

2           Your Honor, every community and family tie that is

3    important to Mr. Pacheco-Monje lives here in Denver area.

4    He is not a risk of flight.

5           And, Your Honor, furthermore, you know, given his

6    family's financial dependence on him, regardless of the

7    outcome of this case, it is very important to him to be able

8    to provide for his family.  Even if this ends in, you know,

9    be deported or in him being, you know, sentenced to a term

10   of imprisonment, he wants to be able to make sure that his

11   family is taken care of.  So that is further evidence that

12   he does not pose a risk of flight as is alleged by the

13   government.

14          He also has two grandchildren who live here in the

15   Denver area that he visits regularly.

16          Obviously, Mr. Pacheco-Monje does not have any

17   control over what Department of Homeland Security choses to

18   do in terms of their procedure.  But even if he has a hold

19   for ICE detention, ICE has discretion to release him and,

20   obviously, the Government can speak to their counterparts in

21   the Federal Government and try to make arrangements for him

22   to be released if they have a concern that this case will

23   not be resolved in the event that he is deported.

24          Your Honor, these are not reasons to detain him

25   pretrial because the findings that the Court must make are

1    under 3142, as the case of Ailon-Ailon makes very clear,

2    that the risk of deportation is not a factor in determining

3    whether or not someone should be detained pretrial in a

4    criminal case.

5            All of his family ties are here.  He has stable

6    employment here, Your Honor.  He has no history of failing

7    to appear in court.  He will abide by the Court's orders.

8    He has a demonstrated track record of compliance with Court

9    orders over the last two years, you know, on probation in

10   state court.  He remains in compliance with probation.

11           And given the progress that he has made on

12   probation in terms of they step down now to the level of

13   where he only has to call in once a month, you know, we

14   would submit to the Court restrictive means of pretrial

15   release are not necessary in this case; however, if the

16   Court finds that a GPS monitoring or home detention is

17   necessary and appropriate, Mr. Pacheco-Monje will absolutely

18   comply with that requirement, you know.

19           He has a statutory and constitutional right to

20   reasonable bail and we ask that he be released.

21           THE COURT:  How did he come to the attention of

22   ICE that the detainer was lodged against him?

23           MS. LATENDRESSE:  Your Honor, the only information

24   I have about this case is the Indictment and the Pretrial

25   Report.  It sounds like, from the Government's arguments,

1    that apparently ICE tried to issue a hold in 2018 that was

2    not honored by the Denver jail.  However, he was released

3    from that case on home detention.  So he obviously -- they

4    knew where to find him if they had been looking for him.

5             He has been under supervision since January of

6    2020.  I'm sorry, I -- my suspicion is that they just

7    decided not to bother him, but just based on the fact that

8    his location was readily ascertainable.

9             THE COURT:  Okay.  Anything else?

10            MS. LATENDRESSE:  No, Your Honor.

11            THE COURT:  All right, thank you.

12            From the United States, help me understand this

13   Ailon-Ailon decision and how it plays into this.

14            So is your argument that I can take into account

15   -- does the decision mean I cannot take into account the

16   fact that there is an ICE Hold, or that there are

17   deportation proceedings going against him or what?  Because

18   you mentioned it and I was trying to grapple with what you

19   think -- how you think I should consider it

20            MS. SPENCER:  Under U.S. Code Section 3142(f)

21   under Title 18 -- this is a 3142(f)(2) case, which requires

22   the Government to explain why the defendant presents a

23   serious flight of risk or a serious risk of obstruction at

24   the outset to get the three days for a detention hearing.

25   And this a (f)(2) case.

1          When we appeared at the initial three days ago,

2   the defense agreed to set this over for three days.  And, to

3   me, that's a waiver of the Government having to show this

4   risk of flight.  So now we are at the stage where we are

5   talking about those conditions that can be set on release of

6   bond.

7          Ailon-Ailon specifically talked about the

8   showing --

9          THE COURT:  So under your view, we are under (g)?

10          MS. SPENCER:  Yes, and not under (f)(2) --

11          THE COURT:  Okay.

12          MS. SPENCER:  -- where we could just show a

13   serious risk of flight, because "flee" is the language that

14   Ailon-Ailon specifically looked at because it said, if you

15   are going to be deported by another agency, that is not a

16   voluntary flight.

17          And so a nonvoluntary flight does not equal that

18   serious risk of flight for the Government to make its

19   showing.  They did not say that that held for the (g)

20   section, which is whether there is a combination of

21   conditions that will reasonably assure his appearance, as

22   required.  It doesn't talk about volitional versus

23   nonvolitional for his appearance being here as required.

24          So, for instance, if Your Honor let him out on

25   bond and he was driving drunk and picked up on a DUI and was

1   put into custody and then he doesn't come here for the next

2   court appearance, that is a nonvolitional nonappearance

3   because he is being held in another jurisdiction, but it's

4   still a failure to appear.

5           THE COURT:  Um-hmm.

6           MS. SPENCER:  So it's the same sort of thing, only

7   we happen to know it's not going to be a DUI, it's a ICE

8   Hold, and that they will -- you know, they will exercise

9   that upon his release from the Marshal's custody.  If you

10  find that bond conditions are appropriate, then ICE will be

11  notified because they have an appropriate hold on him and

12  they will come and pick him up and he will be deported

13  within a month.

14          THE COURT:  Is that -- just educate me a little

15  bit about the immigration deportation proceedings.  You say

16  that with some certainty, that he will be deported within a

17  month.  Is that -- is that -- how can you say that with such

18  certainty?

19          My only knowledge of this is what I hear from --

20  you know, read in the newspaper just because I don't do a

21  lot of that kind of work.  But my understanding is sometimes

22  those deportation proceedings get delayed and if he is

23  released from custody on a bond from ICE, then that could

24  take years to effectuate the deportation.  At least that's

25  what I have heard.  I don't know.  So I'm asking.

1          MS. SPENCER:  These are the different categories,

2  these are terrific questions --

3          THE COURT:  Okay.

4          MS. SPENCER:  -- and it's a very complex area.

5          So what they are telling me is because of the

6  defendant's prior removals, what he has been served with is

7  a Notice of Intent.  That is a decision to reinstate the

8  prior order of removal.

9          THE COURT:  I see.

10          MS. SPENCER:  And that is an automatically

11  self-executing Court Order.  So it doesn't entitle him to

12  come back to court and go through those hearings, asylum and

13  all of those sort of things.  It is an automatic order that

14  has been reinstated, and so his deportation will take place

15  without any judicial proceedings attached to it.  So he will

16  be deported within that 20- to 30-day window.

17          THE COURT:  I see.

18          MS. SPENCER:  As you might imagine, the things

19  that are in the news, are sort of the bigger newsworthy

20  cases, not the tens of thousands of automatic deports that

21  we see in this country every single day.

22          THE COURT:  Okay.

23          MS. SPENCER:  I think that's what --

24          THE COURT:  Part of your argument is, you know, to

25  ensure that the criminal laws are enforced, you want to make

1   sure that the defendant isn't involuntarily sent away by

2   ICE, which, is in your view, likely to happen, in light of

3   his status here and this Intent to Deport.  So you want to

4   delay ICE's action until he answers for the allegations in

5   the Indictment here?

6           MS. SPENCER:  I couldn't have said it better.

7   That's exactly -- that's exactly right.

8           THE COURT:  I see.  Okay, thank you.

9           Anything else in rebuttal?

10          MS. SPENCER:  I do have concerns, Your Honor, that

11  he -- while he is going to be, you know, taken right back to

12  work, whether or not that's actually legal or not, given

13  that he does have aliases of using prior Social Security

14  numbers, he is facing deportation.

15          Whether that deportation happens now, because he

16  is released, or whether it happens after the end of this

17  case, whether he is acquitted or convicted, he will be

18  deported.  Whether he is serving additional time or not is

19  the question.  Whether he's being held on bond in this case

20  or if he is getting released and he is getting deported, he

21  will be.

22          THE COURT:  And so your suggestion is the calculus

23  would be, I'm going to be deported one way or the other,

24  might as well voluntarily abscond and not serve the time?

25          MS. SPENCER:  He has been successful at eluding

1    ICE for a few year, yes.

2            THE COURT:  I see, okay.

3            MS. SPENCER:  The idea that, well, you know, they

4    just didn't want to or just didn't bother to pick him up is

5    simply not an accurate recitation of the ways things work at

6    Immigration and Custom Enforcements.

7            They placed an appropriate hold on him through the

8    Denver County jail and many of the local law enforcement

9    agencies simply do not honor those holds and will not let

10   Immigration and Customs Enforcement know when somebody's

11   going to be released from the jail.

12           So they are doing that, it just eliminates an ICE

13   Hold, so then they have to expense resources to try and

14   locate people.  I mean, that's what they did in this case

15   and that takes some time to do.

16           So when they picked him up, they brought him to

17   court and here we are.

18           THE COURT:  Okay, thank you.  I asked a few

19   questions.  And, defense counsel, if you would like to

20   respond, feel free.

21           MS. LATENDRESSE:  Yes, Your Honor.

22           So first, Your Honor, I do -- we discussed this

23   Ailon-Ailon case.  I do want to give the cite for the record

24   in case the Court doesn't have access to that.  It's 875

25   F.3d 1334, it's a 2017 case.  I also do have a paper copy

1    with me if the Courts want --

2            THE COURT:  Yeah.  Why don't you bring it up.

3    Thank you.

4            Okay, give me a second.

5            MS. LATENDRESSE:  Yes, Your Honor.

6            THE COURT:  What's your response to Government's

7    arguments that this decision only applies to the analysis

8    under (f)(2) and not under (g)?

9            MS. LATENDRESSE:  Well, Your Honor, I think I --

10   initially I would dispute the Government's interpretation of

11   the statute.  The case states explicitly there's a two-step

12   analysis for detention.

13           They first put meets their burden under (f)(2) and

14   the Court must make a finding under (f)(2) before we can

15   proceed to subsection (g).

16           You know, in that case, the trial court initially

17   ordered -- or, sorry, initially ordered that the defendant

18   be detained under (f)(2)(A) and the Court made findings that

19   the Court's holding was based on the finding that that

20   initial (f)(2) threshold had not been met.

21           However, even if we addressed this under (g), I

22   think that the language in the opinion, while it focuses on

23   (f)(2) also addresses the appearance in court because it

24   points out that it is a defense to -- under the Bail Reform

25   Act, that a person involuntarily failed to appear in court,

1    and I think that that would apply under both (g) or (f)(2),

2    Your Honor -- if we need to discuss this -- that this is

3    really just not something that can be considered under the

4    Bail Reform Act, whether or not there is a separate

5    proceeding that could support -- subject a person to

6    involuntary removal.

7         And also, Your Honor, it disputes the Government's

8    allegation that Mr. Pacheco-Monje waived the issue under

9    (f)(2).  I was not present at his initial appearance

10   hearing.  I entered on this case after that hearing.  So I

11   cannot say what was or was not said at that hearing.  I

12   would be surprised if my colleague, who handled the hearing,

13   waived that issue.  But regardless, you know, I think that

14   under the holding in Ailon-Ailon, there still has to be a

15   determination made by the Court.

16        And so I object to the Government's argument that

17   we waived that issue.

18        THE COURT:  All right.  Hold on.  So there's a

19   paragraph here that -- and I will read it, just so you know

20   what I'm looking at -- where the Tenth Circuit is saying:

21   It is not clear to us that ICE must remove Ailon-Ailon

22   before trial and the illegal reentry prosecution may well be

23   completed prior to the 90-day deadline . . . because, I

24   guess, with respect to that defendant, there was a 90-day

25   deadline or where it was anticipated he would be removed.

1          The Government also argues that pretrial detention

2    is justified by the inconvenience to ICE that will be

3    involved if it put take Ailon-Ailon into custody under the

4    detainer.

5          But what about that issue?  The usual circumstance

6    -- might not be so unusual.  But the specific circumstances

7    of this defendant and the reinstitution of the prior

8    deportation order, which essentially will expedite the

9    deportation process, I can almost guarantee or predict with

10   some certainty that his prosecution for illegal reentry will

11   not be addressed within the next 30 days, right?

12         So that is slightly different from the Ailon-Ailon

13   situation where we can say, almost with certainty, that if

14   he is released on bond and somehow -- that if he is released

15   on bond, he will go into ICE custody and then ICE will

16   deport him within 30 days because he doesn't have the right

17   to appeal or seek, you know, amnesty or whatever he might

18   seek in a judicial process.

19         Does that make it different in your view?

20         MS. LATENDRESSE:  No, Your Honor, it does not.

21         I think the heart of the holding in Ailon-Ailon,

22   from my reading, is that a person cannot be detained under

23   the Bail Reform Act for -- because of the risk that they

24   will be deported, because that is something that is outside

25   of Mr. Pacheco-Monje's control.

1          If he is deported, that is ultimately something

2     that is, you know, a nonvoluntary removal.  It's the federal

3     Government who decides.

4          I think, you know, we don't know for sure what is

5     going to happen with his immigration proceedings.  He does

6     have family, he may choose to retain counsel.  Even if he is

7     not automatically entitled to a hearing, you know, he may

8     choose to request in the Immigration Court, there are

9     unknowns there.  But in the end, it's not a factor under the

10    Bail Reform Act.

11         As the opinion explicitly states, there are two

12    separate analyses under the Bail Reform Act which is, first,

13    you know, has the Government met its burden under (f)(2) to

14    establish a serious risk of flight?  And then second, are

15    there conditions of release to will reasonably assure his

16    appearance as required and safety of any other person in the

17    community.

18         And I think, you know, just a holistic reading of

19    the opinion makes clear that reasonably assures appearance

20    actually does mean, you know, his voluntary appears.  If he

21    is removed involuntary, we submit to the Court that that is

22    not a factor that the Court should consider under either

23    subsection.  But given the complete lack of evidence with

24    respect to the serious risk of flight, Your Honor, we would

25    ask that the Court just release him, based on the fact that

1    they have not met that initial threshold for detention.

2          THE COURT:  Okay.  Continuing to read the

3    decision, I did see the concluding, or close to concluding

4    paragraph where the Court says:  In any event, to the extent

5    any conflict exists, it is between the two branches, ICE and

6    the U.S. Attorney's Office.  It's a matter for the executive

7    branch to resolve internally.  The problem here is not that

8    the defendant will absent himself from the jurisdiction, but

9    that the two Article II agencies will not coordinate their

10    respective efforts.  It's not appropriate for an Article III

11    judge to resolve executive branch turf battles.

12          So that tends to supports your view.

13          Okay, thank you.  So the Court has heard argument,

14    the Court has jurisdiction over this subject matter, the

15    action over the parties.  Venue is proper in the District of

16    Colorado.  Each party has been given a fair opportunity to

17    be heard on the issue of detention.

18          I believe that this is under 3142(g) and the

19    factors to be considered pursuant to 3142(g) in determining

20    whether there are conditions of release that will reasonably

21    assure the appearance of defendant as required for the

22    safety of the community are the nature and circumstances of

23    offense charged, including whether it's a crime of violence,

24    terrorism and use of controlled substance, the weight of the

25    evidence against the defendant, which is a very strong; the

1   history and characteristics of defendant, including his

2   character, physical and mental condition, family ties,

3   employment, financial resources, length of residence in the

4   community, community ties, past conduct, history relating to

5   drug or alcohol abuse, criminal history, record concerning

6   appearance at court proceedings, whether on probation,

7   parole or release pending trial, sentencing appeal or

8   completion of sentence at the time of the offense.

9          The things that jump out at me, I recognize that

10  he has strong community ties and family ties here in

11  Colorado, but the thing that really jumps out at me are

12  whether, it's three, four or five prior deportations, it's

13  just a flaunting of the law and the orders of Court.  And he

14  is a very likely to be convicted because his very presence

15  here is very strong evidence that he has reentered illegally

16  after deportation.

17         And so he may be facing deportation through ICE or

18  if he is convicted here, he will do time and then be

19  deported.  So he has got a very strong incentive to flee,

20  not appear, return voluntarily to Mexico, perhaps, to avoid

21  the prison sentence or continue to live under the radar in

22  Colorado.

23         So for all those reasons, I find that detention is

24  appropriate.  That Government has met their burden of

25  proving that he is not likely to show up and it's primarily

1    the past history of failure to abide by Court orders and

2    deportation orders that leads me to that conclusion.

3              Anything else for United States?

4              MS. SPENCER:  No, thank you, Your Honor.  We have

5    future courts dates already from Judge Brimmer's Chambers.

6              THE COURT:  Anything else from the defense?

7              MS. LATENDRESSE:  Nothing further at this time.

8              THE COURT:  Okay.

9              MS. LATENDRESSE:  I just want to be clear that

10   this order is being made over our objection, so I'm not

11   adding anything to it.

12             THE COURT:  I totally get it's being made over

13   objection, and thank you for your excellent argument.

14             And I want to just tell Mr. Pacheco-Monje, he has

15   a very good lawyer and I'm not the last words.  This is

16   something that can be appealed.  And if you do, more power

17   to you.

18             I would like, certainly appreciate some guidance

19   from the Article IIIs on this issue, but I have made the

20   best decision I can under the circumstances.

21             So you all have a good day, we will be in recess.

22             (Whereupon, the within hearing concluded 2:41.)

23

24

25

```
 1                    TRANSCRIBER'S CERTIFICATION

 2     I certify that the foregoing is a correct transcript to the

 3     best of my ability to hear and understand the audio

 4     recording and based on the quality of the audio recording

 5     from the above-entitled matter.

 6

 7     /s/ Dyann Labo                    May 13, 2022

 8     Signature of Transcriber               Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```